CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 03 2010

JULIA C. DUDLEY, CLERK
BY: H McDonald
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:10CR00015 |
| | ) | |
| BOBBY JAY ELKIN, JR., | ) | Violation: 18 U.S.C. § 371 |
| | ) | |
| Defendant. | ) | |

## INFORMATION

The United States Attorney charges:

INTRODUCTION

At all times relevant to this Information:

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from making payments to foreign government officials to obtain or retain business. Specifically, the FCPA prohibited any domestic concern from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person or securing any improper advantage. 15 U.S.C. § 78dd-2(a). Furthermore, the FCPA required certain corporations to make and keep books, records and accounts which accurately and

fairly reflect transactions and dispositions of the company's assets and prohibited the knowing falsification of such books, records or accounts. 15 U.S.C. §§ 78m(b)(2)(A) and (b)(5).

## RELEVANT INDIVIDUALS AND ENTITIES

2. Prior to 2005, an unnamed co-conspirator company, hereinafter referred to as "Company A," was a leaf tobacco merchant which maintained its principal place of business in Danville, Virginia. Company A purchased and processed leaf tobacco grown throughout the world and sold it to manufacturers of tobacco products. Another corporation, hereinafter referred to as "Company B," also operated as a leaf tobacco merchant worldwide. Both Company A and Company B were "issuers" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a).

3. In 2005, Company A and Company B merged to form another company, hereinafter referred to as "Company C," which also was engaged in business as a leaf tobacco merchant worldwide. Company C was a publicly traded Virginia corporation which maintained its principal place of business in Raleigh, North Carolina.

4. Company A had been purchasing tobacco from growers in the Republic of Kyrgyzstan ("Kyrgyzstan") since approximately 1994. Prior to 2005, Company A maintained an unnamed co-conspirator subsidiary corporation, organized under the laws of Kyrgyzstan (the "Kyrgyz Subsidiary"), which purchased and processed tobacco grown in Kyrgyzstan,

and shipped processed tobacco to Company A's customers throughout the world. After the 2005 merger, Company C continued to operate in Kyrgyzstan.

5. Defendant Bobby Jay Elkin, Jr. ("ELKIN"), was an American citizen from North Carolina who began working for Company A in approximately 1992 as a tobacco blending and grading supervisor. In early 1996, Company A transferred ELKIN to Kyrgyzstan, and he was promoted to Country Manager for the Kyrgyz Subsidiary in Kyrgyzstan in or about November 1996. Accordingly, defendant ELKIN was a "domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(A).

6. In or about spring 1996, the Government of Kyrgyzstan established the Kyrgyz Tamekisi ("Tamekisi"), an agency and instrumentality of the government, to manage and control the government-owned shares of the tobacco processing facilities throughout Kyrgyzstan. "Kyrgyz Official A," served as the General Director of the Tamekisi. Kyrgyz Official A was a "foreign official" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(2)(A).

## BACKGROUND

7. On or about September 27, 1996, Company A entered into a written agreement with the Tamekisi concerning the manner in which Company A would be allowed to conduct business in Kyrgyzstan.

8. On or about October 22, 1996, a senior executive involved in Company A's European operations and Kyrgyz Official A agreed to a written amendment to the previous

3

agreement whereby the Tamekisi agreed, among other things, to issue a license to Company A to process and export 2000 tons of tobacco from the 1996 crop. Further, Company A agreed to pay the Tamekisi $0.18 per kilogram for future tobacco processing services plus an additional $0.05 per kilogram for "financial assistance."

9. From in or about October 1996, and continuing through at least February 2004, defendant ELKIN and other co-conspirators personally delivered cash payments on behalf of Company A and the Kyrgyz Subsidiary to Kyrgyz Official A totaling approximately $2,674,060. These payments were calculated roughly at the rate of $0.05 per kilogram of tobacco processed by the Tamekisi and represented the "financial assistance" called for in the written agreement, although the Tamekisi performed no additional services to Company A. In fact, the "financial assistance" payments to Kyrgyz Official A were bribes, intended by ELKIN and other known and unknown officers and employees of Company A to influence acts or decisions of Kyrgyz Official A in his official capacity and to secure Company A's continued access to the tobacco processing facilities controlled by the Tamekisi.

10. In Kyrgyzstan, each local governmental unit was headed by an official known as an "Akim," who exercised authority over the sale of tobacco by the growers within the municipality or local geographical area. Beginning in or about 1996, it became necessary for the Kyrgyz Subsidiary and defendant ELKIN to obtain approval from local Akims to purchase tobacco from the growers in each area. Several of the Akims demanded payment

of a "commission" from defendant ELKIN, in order to secure the relevant Akim's approval for the Kyrgyz Subsidiary to purchase tobacco from local growers.

11.     From in or about January 1996, and continuing through at least March 2004, defendant ELKIN and other co-conspirators personally delivered numerous cash payments on behalf of Company A and the Kyrgyz Subsidiary to the Akims of five different municipalities totaling approximately $254,262. In fact, the payments to the Akims were bribes, intended to influence the acts and decisions of the Akims and to secure the Kyrgyz Subsidiary's continued ability to purchase tobacco from growers in the municipalities controlled by the Akims.

12.     During periodic audits of the Kyrgyz Subsidiary's business affairs in Kyrgyzstan, the Kyrgyz Tax Inspection Police assessed penalties and threatened to shut down the Kyrgyz Subsidiary of Company A. From in or about March 2000 through in or about March 2003, defendant ELKIN and other co-conspirators made approximately nine cash payments to officers of the Kyrgyz Tax Inspection Police totaling approximately $82,850 in order to influence the acts and decisions of the Kyrgyz Tax Inspection Police and to secure the Kyrgyz Subsidiary's continued ability to conduct its business in Kyrgyzstan.

13.     Company A and the Kyrgyz Subsidiary maintained a bank account in the name of defendant ELKIN and other Kyrgyz Subsidiary employees at the Demir Kyrgyz International Bank in Osh, Kyrgyzstan, that was known as the "special account." Defendant ELKIN and other co-conspirators withdrew cash from the special account, in the form of

U.S. currency, which he and other co-conspirators used to make the payments to Kyrgyz Official A, the Akims and the Kyrgyz Tax Inspection Police as described above.

14. When defendant ELKIN and his co-conspirators needed to replenish money in the special account, he and other Kyrgyz Subsidiary employees sent requests for funds by electronic mail or facsimile transmission to other employees and officers of Company A located in the United Kingdom and the Netherlands. Each such request was accompanied by a wire transfer request form which ELKIN knew would be forwarded by other Company A employees to Company A's Financial Accounting Department in Danville, Virginia, by electronic mail or by facsimile transmission.

15. Funds were transferred into the special account at the Demir Kyrgyz International Bank from a bank account of a Swiss subsidiary of Company A maintained at the KBC Bank in Antwerp, Belgium.

## THE CONSPIRACY

16. Beginning in or about January 1996 and continuing through at least in or about March 2004, in the Western District of Virginia and elsewhere, the defendant, BOBBY JAY ELKIN, JR., did unlawfully, willfully and knowingly combine, conspire, confederate and agree with Company A, the Kyrgyz Subsidiary and persons known and unknown, to commit an offense against the United States, that is, being a domestic concern, to willfully make use of the mails and the means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any

offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of: (a) influencing acts and decisions of such foreign official in his official capacity; (b) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (c) securing an improper advantage; and (d) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendant ELKIN, Company A and others known and unknown in obtaining and retaining business for and with, and directing business to, Company A and others, in violation of Title 15, United States Code, Section 78dd-2(a).

## PURPOSE OF THE CONSPIRACY

17.     The purpose of the conspiracy was to make corrupt payments to foreign officials, that is, officials of state-owned enterprises and other public officials in Kyrgyzstan, in order to secure business for Company A and the Kyrgyz Subsidiary.

## MANNER AND MEANS OF THE CONSPIRACY

18.     Defendant ELKIN and his co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

    a.      It was part of the conspiracy that defendant ELKIN opened a special account at the Demir Kyrgyz International Bank, not in the name of Company A or the

Kyrgyz Subsidiary but in his own name and the name of another Kyrgyz Subsidiary employee, for the purpose of obtaining cash to make corrupt payments to public officials of Kyrgyzstan including, but not limited to, Kyrgyz Official A, the Akims and the Kyrgyz Tax Inspection Police.

    b. It was further part of the conspiracy that defendant ELKIN would send electronic mail messages to employees and officers of Company A in the United Kingdom and the Netherlands, requesting the transfer of additional funds to the special account which would be used, in part, to make corrupt payments to public officials of Kyrgyzstan including, but not limited to, Kyrgyz Official A and the Akims.

    c. It was further part of the conspiracy that Kyrgyz Official A would call ELKIN periodically and demand payment of certain amounts in cash in order to secure the Kyrgyz Subsidiary's continued access to the tobacco processing facilities controlled by the Government of Kyrgyzstan through the Tamekisi.

    d. It was further part of the conspiracy that defendant ELKIN and his co-conspirators would withdraw cash money, in United States currency, from the special account at the Demir Kyrgyz International Bank, and deliver the corrupt payments to Kyrgyz Official A, the Akims and the Kyrgyz Tax Inspection Police.

    e. It was further part of the conspiracy that defendant ELKIN and his co-conspirators would make corrupt payments totaling approximately $3,050,672 to foreign officials in Kyrgyzstan, namely Kyrgyz Official A, the Akims and the Kyrgyz Tax Inspection

Police, in order to obtain and retain business for Company A and the Kyrgyz Subsidiary and, as a result, Company A would earn approximately $4,816,775 in profits from the business it conducted in Kyrgyzstan as a result of these corrupt payments.

## OVERT ACTS

19. In furtherance of the conspiracy and to achieve its purpose and object, defendant ELKIN and his co-conspirators committed the following overt acts, among others, in the Western District of Virginia and elsewhere:

    a. On or about September 26, 1997, defendant ELKIN wrote a memorandum that was sent by facsimile transmission from the offices of a subsidiary of Company A in Aalsmeer, Netherlands, to officers of Company A or its subsidiaries located at its corporate offices in Danville, Virginia, in which he stated: "As in last years situation, there are also some 'special assistance' charges that will have to be included as was the case last year. In last years case, we paid the Kyrgyztamekisi $0.05 per kilogram as a development charge for the tobacco market. This year the charge has been reduced to $0.025 per kilogram as development money but, they also want an additional $0.02 per kilogram which will be 'black' money. This black money will be split 4 ways one part to [Kyrgyz Official A], one part to [Kyrgyz Official B], one part to [Kyrgyz Official C] and one part to [Company A]."

    b. On or about the dates set forth below, defendant ELKIN and other co-conspirators delivered cash in United States currency in the amounts set forth below, totaling approximately $2,674,060, to Kyrgyz Official A:

| Date | $ Amount | Date | $ Amount |
|---|---|---|---|
| October 1996 | 5,000 | February 2001 | 34,000 |
| December 1996 | 330,000 | March 2001 | 10,000 |
| October 1997 | 30,160 | June 2001 | 8,000 |
| October 1997 | 62,500 | June 2001 | 20,000 |
| July 1998 | 1,000 | July 2001 | 20,000 |
| August 1998 | 50,000 | August 2001 | 105,000 |
| October 1998 | 10,000 | December 7, 2001 | 10,000 |
| November 1998 | 50,000 | December 7, 2001 | 10,000 |
| January 1999 | 15,000 | January 9, 2002 | 85,000 |
| January 1999 | 48,000 | February 4, 2002 | 109,000 |
| April 1999 | 3,000 | May 24, 2002 | 51,000 |
| May 1999 | 45,000 | June 12, 2002 | 25,000 |
| September 1999 | 50,000 | November 22, 2002 | 20,000 |
| September 1999 | 90,000 | December 16, 2002 | 50,000 |
| November 1999 | 5,000 | February 8, 2003 | 115,000 |
| November 1999 | 70,000 | April 17, 2003 | 340,000 |
| March 2000 | 196,000 | June 13, 2003 | 13,400 |
| May 2000 | 34,000 | December 29, 2003 | 5,000 |
| September 2000 | 10,000 | February 2004 | 100,000 |
| October 2000 | 185,000 | February 28, 2004 | 135,000 |
| January 2001 | 94,000 | February 28, 2004 | 15,000 |
| **TOTAL PAYMENTS TO KYRGYZ OFFICIAL A** | | | **$2,674,060** |

  c. On or about the dates set forth below, the defendant ELKIN and other co-conspirators delivered cash in United States currency in the amounts set forth below, totaling approximately $195,562, to the Akim of the Nookat municipality:

| Date | $ Amount | Date | $ Amount |
|---|---|---|---|
| January, 1996 | 700 | February, 2000 | 20,000 |
| January, 1996 | 1,600 | June, 2000 | 1,100 |
| January, 1996 | 500 | September, 2000 | 1,000 |
| January, 1996 | 500 | October, 2000 | 502 |
| January, 1996 | 1,500 | November, 2000 | 10,000 |
| December, 1996 | 1,000 | December, 2000 | 5,000 |
| February, 1997 | 2,000 | January, 2001 | 2,700 |
| March, 1997 | 2,000 | March, 2001 | 5,000 |
| March, 1997 | 9,000 | August, 2001 | 2,500 |
| April, 1997 | 5,000 | January 28, 2002 | 10,000 |
| October, 1997 | 1,500 | April 30, 2002 | 20,000 |
| November, 1997 | 2,000 | October 12, 2002 | 10,000 |
| September, 1998 | 500 | December 16, 2002 | 10,000 |
| September, 1998 | 5,000 | December, 2002 | 10,000 |
| September, 1998 | 5,000 | April 21, 2003 | 7,960 |
| December, 1998 | 2,000 | September 3, 2003 | 20,000 |
| January, 1999 | 4,000 | November 18, 2003 | 5,000 |
| November, 1999 | 2,000 | March 31, 2004 | 5,000 |
| November, 1999 | 4,000 | ---------- | ----- |
| TOTAL PAYMENTS TO THE AKIM OF NOOKAT | | | $195,562 |

d. On three separate occasions from June 2001 through December 2002, defendant ELKIN and other co-conspirators delivered cash in United States currency, totaling approximately $6,700, to the Akim of the Aksy Municipality.

e. On nine separate occasions from March 1999 through February 2004 defendant ELKIN and other co-conspirators delivered cash in United States currency, totaling approximately $46,000, to the Akim of the Alabuka municipality.

f. On or about December 11, 2002, defendant ELKIN and other co-conspirators delivered cash in United States currency, in the amount of approximately $2,000 to the Akim of the Alafuko municipality.

g. On or about March 31, 2004, defendant ELKIN and other co-conspirators delivered cash in United States currency, in the amount of approximately $4,000 to the Akim of the Chilik municipality.

All in violation of Title 18, United States Code, Section 371.

TIMOTHY J. HEAPHY
UNITED STATES ATTORNEY

By: _____
Donald R. Wolthuis
Assistant United States Attorney

DENIS J. McINERNEY, CHIEF
Fraud Section, Criminal Division
United States Department of Justice

By: *John A. Michelich* (signature)

John A. Michelich
Senior Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
10th and Constitution Ave., N.W.
Bond Building, Room 4118
Washington, D.C.  20530
(202) 514-0931